[No. 26461-7-II.   Division Two.   September 6, 2002.]

CLYDE S. BECK, JR., *Individually and as Guardian,*
*Respondent,* v. FARMERS INSURANCE COMPANY
OF WASHINGTON, *Appellant.*

*Patricia Campbell Fetterly* and *Carol J. Cooper* (of *Davies Pearson, P.C.*), for appellant.

*Paul A. Lindenmuth* (of *Law Offices of Ben F. Barcus & Associates, P.L.L.C.*), for respondent.

MORGAN, J. — The main question in this case is whether, under the facts and circumstances present here, an Underinsured Motorist (UIM) insurer is bound by the outcome of a lawsuit in which the parties were the UIM insured and a tortfeasor, and in which the UIM insurer did not appear or participate. For the reasons that follow, the answer is no.

In June 1992, Clyde Beck and two of his daughters, one of whom was eight-year-old Tara,[1] were rear-ended by Gertrude Dawson. All three were entitled to UIM and Personal Injury Protection (PIP) coverage through Farmers Insurance Company of Washington (Farmers). Dawson had liability coverage through National General Insurance Company (NGIC). According to the trial court's later findings, Dawson was wholly responsible for the accident.

---

[1] We will refer to both Clyde and Tara by their first names because their last names are the same.

Acting through Clyde, Tara made a liability claim against Dawson, and UIM and PIP claims against Farmers. She initially described her injuries as being "neck and upper back."[2] A year or so later, she also claimed a head injury.

In 1995, Tara sued Dawson.[3] She and Dawson agreed to arbitrate rather than litigate, and in August and September 1997, she and Dawson participated in an arbitration hearing. It is disputed whether Farmers had notice of the lawsuit, but it is undisputed that Farmers did not appear or participate in the arbitration hearing. The arbitrator ruled that Tara had sustained $307,627.75 in damages due to Dawson's negligence.

After the arbitration award, Tara demanded that Farmers pay its UIM limits of $100,000.[4] She based her demand on *Finney v. Farmers Insurance Co.*[5] and *Fisher v. Allstate Insurance Co.*,[6] which hold that the insurer is "bound by the 'findings, conclusions and judgment' entered in the action against the tortfeasor when it has notice and an opportunity to intervene in the underlying action against the tortfeasor."[7] Farmers responded that it was not bound by the Dawson arbitration award because it had not received notice of the Dawson lawsuit. It offered to settle for $20,000, or to arbitrate if that offer was not acceptable.

On June 17, 1998, Tara filed the present lawsuit. She alleged in part that Farmers was bound by the Dawson arbitration award; that she was entitled to recover the $100,000 UIM policy limits; and that she was entitled to a

---

[2] Ex. 2-2.

[3] The record does not contain a copy of this complaint. It shows only that the cause number was Pierce County Cause No. 95-2-06381-6.

[4] The record does not show whether all, part, or none of Dawson's $100,000 liability limit went to pay Tara's arbitration award. Given that the arbitration award was for $307,000, however, the matter is immaterial. If Farmers is bound by the arbitrator's award, it owes Tara its UIM limit of $100,000, even if Dawson paid her entire $100,000 on Tara's claim.

[5] 21 Wn. App. 601, 586 P.2d 519 (1978), *aff'd*, 92 Wn.2d 748, 600 P.2d 1272 (1979).

[6] 136 Wn.2d 240, 961 P.2d 350 (1998).

[7] *Fisher*, 136 Wn.2d at 246 (quoting *Finney*, 21 Wn. App. at 618).

judgment so declaring. A bench trial ensued, at which Tara bore the burden of proving that Farmers had received notice of the Dawson lawsuit within the meaning of *Finney* and *Fisher*.[8]

Tara offered several items of evidence in an effort to prove such notice. First, she offered evidence that Farmers knew the basic facts about the accident and its aftermath. Those facts included (a) that the accident had occurred, (b) that it had involved a "hard hit," (c) that Clyde, Tara, and Tara's sister were all claiming serious injuries, (d) that Clyde and Tara were claiming serious brain, neck, and back injuries, and (e) that Clyde, Tara, and Tara's sister were all represented by the same law firm, which was aggressively pursuing all available benefits.

Second, Tara offered evidence of a phone conversation between two attorneys that occurred on November 1, 1995. The attorneys, A. Clarke Johnson and Mark Dietzler, were engaged in separate private practices.[9] Johnson was currently representing Dawson, but being paid by NGIC. Dietzler was not currently representing Farmers, Dawson, or any of the Becks, although in 1994 he had represented Farmers in an arbitration hearing involving PIP claims brought by Clyde Beck. Johnson initiated the phone call and, after identifying himself as the attorney for Dawson, asked whether Dietzler had deposed Clyde in preparation for the 1994 arbitration hearing on Clyde's PIP claim. Dietzler said he had not. Neither testified to any conversation about the Dawson lawsuit.

Third, Tara offered a letter from one of her attorneys to an adjuster at Farmers. The letter read:

February 11, 1997

[Adjuster's name and address]

| | |
|---|---|
| RE: Your Insured/Our Client: | Clyde Beck |
| Date of Loss: | 6/18/95 [sic] |

---

[8] *Finney*, 21 Wn. App. at 618; *Fisher*, 136 Wn.2d at 250.

[9] Two months later, Dietzler left his law firm and became an in-house employee of Farmers.

Your Claim No.:                    32-077883

Dear [adjuster]:

This letter is written to appraise [sic] you that the third-party insurer, National General Insurance Company, through its attorney . . . , has offered the limits of its coverage in this case. As you know, there is a $100,000.00 policy applicable to the third-party litigation. The value of Clyde Beck's claim greatly exceeds the limits of third-party coverage and that is why National General has offered its limits. We estimate that the value of these claims is likely in excess of all available insurance including third-party, PIP and UIM. Please construe this letter as a formal request to open a claim for UnderInsured Motorist Coverage.

As you know . . . , Farmers is not entitled to reimbursement of subrogation until such time as Mr. Beck is made whole. The limits of the third-party insurance are, of course, completely insufficient to fully compensate Mr. Beck.[10]

Based on this evidence, the trial court ruled that Farmers had received notice of the Dawson lawsuit within the meaning of *Finney* and *Fisher*. As a result, it concluded that Farmers had had a reasonable opportunity to appear and protect its interests in the Dawson lawsuit; that Farmers was bound by the Dawson arbitration award; and that Farmers was obligated to pay its $100,000 UIM limit to Tara.

Farmers now claims on appeal that the evidence is insufficient to support the trial court's ruling that Farmers received notice of the Dawson lawsuit within the meaning of *Finney* and *Fisher*. Thus, it says, it is not bound by the Dawson arbitration award, and it is entitled to a fact-finding hearing on Tara's UIM claim.

We begin by examining *Finney* and *Fisher*, as well as the more recent case of *Lenzi v. Redland Insurance Co.*[11] In *Finney*, a UIM insured sued two uninsured tortfeasors for

---

[10] Clerk's Papers at 221.

[11] 140 Wn.2d 267, 996 P.2d 603 (2000).

the wrongful death of his daughter.[12] He furnished his UIM insurer with copies of the summons, complaint, amended complaint, answers, police reports, and various other documents. The UIM insurer did not intervene in the insured-tortfeasor lawsuit. The UIM insured went to trial against one of the tortfeasors, recovering judgment for about $46,000. The UIM insured then filed suit against the UIM insurer. He alleged that the UIM insurer was bound by the arbitration award, and thus that it was now obligated to pay its UIM limits of $30,000. Division Three of this Court agreed, holding that the UIM insurer was "bound by the findings, conclusions and judgment" entered against the tortfeasor.[13]

In *Fisher*, a UIM insured was injured in a motorcycle accident. She sued the underinsured tortfeasor and, in February 1994, took a deposition in which her UIM insurer participated. Sometime over the next six months, she and the tortfeasor agreed to arbitrate instead of litigate. The UIM insurer learned of the arbitration agreement "[s]ometime in September" 1994. The arbitration hearing began on September 19, 1994, and resulted in an award of $236,000. Claiming the UIM insurer was bound by the arbitration award, the UIM insured then sued to recover her UIM limits of $25,000, which were considerably less than the difference between the arbitrator's award ($236,000) and the underinsured tortfeasor's liability limits ($125,000). The UIM insurer acknowledged knowing of the lawsuit, but denied knowing of the arbitration; thus, it said, it was not bound by the arbitration award. The Supreme Court ruled that the UIM insurer was bound by the arbitration award because its knowledge of the lawsuit, as demonstrated by its participation in the deposition, had given it a full and fair opportunity to intervene and protect its interests.

In *Lenzi*, a UIM insured was injured in an auto accident. His UIM limits were $500,000. In August 1998, he filed suit

---

[12] The UIM insured actually served two tortfeasors, but the only one pertinent here is the one against whom he went to trial.

[13] *Finney*, 21 Wn. App. at 618.

against the uninsured tortfeasor. In September 1998, he sent a letter to the UIM insurer in which he stated that he had filed but not yet served the summons and complaint, and with which he enclosed copies of the docket-stamped summons and complaint. In October, he served the tortfeasor but did not further notify the UIM insurer. In November, he obtained a default judgment against the uninsured tortfeasor for about $212,000, again without further notifying the UIM insurer. He then sued the UIM insurer for a judgment declaring that the UIM insurer was bound by the default judgment and, as a result, now obligated to pay $212,000. Agreeing, the Supreme Court held that "the UIM insurer is bound by the default judgment where it had timely notice of the filing of the lawsuit by its insureds and ample opportunity to intervene in the lawsuit to protect its interests."[14] The court reasoned:

> Neither the *Finney-Fisher* rule nor ordinary notions of fair play and substantial justice dictate the [UIM insured] had any duty to [the UIM insurer] other than timely notifying [the UIM insurer] of the filing of the summons and complaint. Receipt of such pleadings is sufficient to put an alert and concerned party on notice that further proceedings in which it might have an interest may occur, and that in order to protect its interests, the interested party needs to act to assure receipt of subsequent pleadings.[15]

Together, *Finney*, *Fisher*, and *Lenzi* hold that a UIM insurer is bound by a judgment or arbitration award against an uninsured or underinsured tortfeasor if the UIM insurer had a reasonable opportunity to appear in, and thus to protect its interests in, the proceedings that led up to the judgment or award. Here then, the question is whether Farmers had a reasonable opportunity to appear, and thus protect its interests, in the Dawson lawsuit.

Farmers' knowledge of the basic facts concerning the accident did not, without more, give Farmers a reasonable

---

[14] *Lenzi*, 140 Wn.2d at 269.

[15] *Lenzi*, 140 Wn.2d at 276.

opportunity to appear in the Dawson lawsuit. As seen above, those facts included (a) that the accident had occurred, (b) that it had involved a "hard hit," (c) that Clyde, Tara, and Tara's sister were all claiming serious injuries, (d) that Clyde and Tara were claiming serious brain, neck, and back injuries, and (e) that Clyde, Tara, and Tara's sister were all represented by the same law firm, which was aggressively pursuing all available benefits. None of these facts gave Farmers any notice that Dawson had been sued, of where the suit was filed, of who the parties were, of what the claims were, or of how Farmers could make an appearance.

The Johnson-Dietzler phone call did not give Farmers a reasonable opportunity to appear in the Dawson lawsuit. The phone call did not give Farmers *actual* knowledge of the Dawson lawsuit, even though Johnson identified himself as an attorney representing Dawson, for there is no evidence that Dietzler relayed its contents to Farmers before the Dawson lawsuit was over. The phone call did not give Farmers *imputed* knowledge of the Dawson lawsuit, because, on November 1, 1995, Dietzler was no longer an agent of Farmers on any matter pertaining to the Becks.[16] And even if the phone call had been relayed or imputed to Farmers, there is no evidence whatever that Dietzler received enough information about the Dawson lawsuit to give Farmers a reasonable opportunity to appear therein.

---

[16] *See, e.g., Gaskill v. N. Assurance Co.*, 73 Wash. 668, 670, 132 P. 643 (1913) (information imputed to principal if agent acquired it "while he is agent"); *Peck v. Siau*, 65 Wn. App. 285, 291, 827 P.2d 1108, *review denied*, 120 Wn.2d 1005 (1992) (to impute knowledge to the principal, "agent must have acquired it while acting within the scope of his or her authority"); *Hendricks v. Lake*, 12 Wn. App. 15, 22, 528 P.2d 491 (1974), *review denied*, 85 Wn.2d 1004 (1975) (knowledge not imputed to principal when agent not working on behalf of principal); *cf. Pietz v. Indermuehle*, 89 Wn. App. 503, 517, 949 P.2d 449 (1998) ("principal's termination of an agent's authority imposes a duty on the agent not to take actions as though he possessed such authority"); RESTATEMENT (SECOND) OF AGENCY § 386 (1958) ("an agent is subject to a duty not to act as such after the termination of his authority"). Tara implies that Dietzler had authority to act for Farmers in this case because he *routinely* represented Farmers or Farmers' insureds in other cases. At the time in question here, however, he was simply retained by Farmers on a case by case basis, and the scope of his authority was limited to each case on which he was retained. He was *not* an officer or employee of Farmers, and he did not have general (as opposed to case-specific) authority to act for Farmers.

There is no evidence, for example, that Johnson said a lawsuit had been filed or served; that he said where it had been filed, or upon whom it had been served; that he said who the parties were or what the claims were; or that he otherwise gave Dietzler the information that Farmers would have needed to make an appearance and protect its interests.

The letter dated February 11, 1997, did not give Farmers a reasonable opportunity to appear in the Dawson lawsuit. It implied the existence of third-party litigation regarding Clyde's claims, not Tara's claims. Moreover, it did not state any of the information that a party would need to assess whether an appearance was necessary to protect its interests and, if so, how such an appearance could be made. The letter did not, for example, state whether a lawsuit had been filed and served; filed but not served; served but not filed; or neither served or filed. Assuming that a lawsuit had been filed, it did not state the venue, the parties, the claims, or a cause number or other identifier. Assuming that a lawsuit had been served but not filed, it did not state upon whom a notice of appearance should be served. In short, it did not contain the information that Farmers would have needed to make an appearance and protect its interests.

We conclude that with no more than the letter, the phone call, and the basic facts of the accident, Farmers lacked the information it needed to decide whether an appearance was necessary, the information it needed to make an appearance if it decided one was necessary, and, overall, a reasonable opportunity to appear in the Dawson lawsuit. The trial court erred by binding Farmers to the Dawson arbitration award, and Farmers continues to be entitled to a hearing on Tara's UIM claim.

The judgment on Tara's UIM claim is reversed, and that claim is remanded for further proceedings.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder

shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HUNT, C.J., and ARMSTRONG, J., concur.

Review denied at 149 Wn.2d 1005 (2003).